# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LISA MIRO, | ) | CIVIL ACTION NO: |
| Plaintiff, | ) ) ) | 3:20-cv-00346(VAB) |
| v. | ) | |
| CITY OF BRIDGEPORT, | ) ) ) | July 7, 2023 |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED JOINT TRIAL MANAGEMENT REPORT[1]**

## I.    TRIAL COUNSEL

**PLAINTIFF:**

John Bochanis
Daly, Weihing & Bochanis, LLC
1776 North Avenue
Bridgeport, CT 06604
Tel.: (203) 333-8500
Fax: (203) 334-0305
lawdwb@sbcglobal.net

**DEFENDANT:**

Robert B. Mitchell (307466)
Reese B. Mitchell (ct30226)
Mitchell & Sheahan, P.C.
999 Oronoque Lane, Suite 203
Stratford, CT 06614
Tel.: (203) 873-0240
Fax: (203) 873-0235
rbmitchell@mitchellandsheahan.com
reesemitchell@mitchellandsheahan.com

## II.    JURISDICTION

## A.    SUBJECT MATTER JURISDICTION

---

[1] Plaintiff's counsel was unable to provide his inserts for this memorandum until after noon on July 7th . The parties were not able to coordinate their joint stipulations,etcetra. because of the lack of time.  Defendant is, therefore, submitting its management report and will coordinate with plaintiff's counsel in the next week so as to be able to file an amended document constituting the joint management report.  The undersigned apologizes for any inconvenience that this may cause the Court, and, respectfully, asks for its indulgence in this matter.

The jurisdiction of this Court is founded upon 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3). This Court has supplemental jurisdiction over any state law claims stated herein pursuant to 28 U.S.C. § 1367.

**B.    PERSONAL JURISDICTION**

This Court has personal jurisdiction over the parties, and personal jurisdiction is not contested.

**III.    <u>JURY/NON-JURY</u>**

The parties will try the case to a jury for a determination of liability under Title VII and the Connecticut Fair Employment Practices Act. The issue of possible awards for compensatory damage for non-economic harm and possible award of damages for economic loss will be submitted to the jury.

**IV.    <u>LENGTH OF TRIAL</u>**

Counsel anticipates that approximately five trial days will be required.

**V.    <u>FURTHER PROCEEDINGS</u>**

The parties anticipate that rulings on motions in limine will be required.

**VI.    <u>NATURE OF CASE</u>**

**A.    NATURE OF EACH CAUSE OF ACTION AND RELIEF SOUGHT**

Plaintiff Lisa Miro brings this civil action for a hostile environment and quid pro quo sexual harassment against the City of Bridgeport pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq. and Connecticut's Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 et seq.

Plaintiff is seeking damages and attorneys' fees and costs.

**B.    AFFIRMATIVE DEFENSES**

Defendant will not assert any affirmative defenses at trial.

## VII.   TRIAL BY MAGISTRATE JUDGE

As of the filing of this Pretrial Memorandum, the parties have not agreed on whether to use or not use a magistrate judge.

## VIII.   EVIDENCE

### A.   PLAINTIFF'S WITNESSES

### B.   DEFENDANT'S WITNESSES

#### 1.Will Call

**John Ricci,** c/o Karsten & Tallberg, LLC, 500 Enterprise Dr., Ste. 4B, Rocky Hill, CT 06067. John Ricci is Bridgeport's former Director of Public Facilities. Mr. Ricci is expected to testify about Plaintiff's background and former job duties; his relationship with Plaintiff before and during the time she worked for the City between June 2016 and September 2017; Ms. Miro's position during that same period; and the circumstances surrounding the City's decisions to conclude Miro's seasonal employment, the offer her a full-time position as a Typist II with the City, and other factual matters related to the specific allegations of Ms. Miro's Amended Complaint.

**Tara Romano**, Rhode Island. Tara Romano is a former field representative from LIUNA. Ms. Romano is expected to testify about several of the allegations Ms. Miro makes in her Complaint.

**Thomas Bucci**, Willinger, Willinger, & Bucci, 1875 Park Avenue, Bridgeport, CT 06604. Thomas Bucci is an attorney at Willinger, Willinger, & Bucci. Attorney Bucci can authenticate documents and is expected to testify about several of Ms. Miro's factual allegations.

#### 2.   May Call

3

**Bonnie Lambert,** c/o City of Bridgeport.  Bonnie Lambert was a former co-worker on the 2015 and 2018 Ganim campaigns and a current Bridgeport employee. Ms. Lambert is expected to testify about the relationship between John Ricci and Lisa Miro between December 2015 and September 2017.

**Tammy Papa,** c/o City of Bridgeport. Tammy Papa is the Director of the Lighthouse Youth Program. Ms. Papa is expected to testify about Ms. Miro's employment conditions between June 2016 and September 2017.

**Mark Harp,** c/o City of Bridgeport.  Mark Harp is the Youth Program Manager at the Lighthouse Youth Program. Mr. Harp is expected to testify about his selection for the Youth Program Manager position, how Ms. Miro was unqualified, and the facts behind specific allegations in Ms. Miro's Amended Complaint [Docket No. 43].

**Philip White**, 188 Flint Ridge Road, Monroe, CT 06468. Phil White is a former labor relations officer for the City of Bridgeport. Mr. White is expected to testify about the City's decisions to conclude Ms. Miro's seasonal employment, to offer her a permanent position as a Typist II with the City, and other factual matters related to Ms. Miro's Amended Complaint.

**Eric Amado,** c/o City of Bridgeport. Eric Amado is Bridgeport's current Personnel Director and a former City Human Resources Generalist. Mr. Amado is expected to testify to the City's decision to hire Ms. Miro for a seasonal position, conclude her seasonal employment with the City, offer her a permanent position as a Typist II, and other factual matters related to Ms. Miro's Amended Complaint.

**Steven Snipes,** c/o LIUNA.   Steven Snipes is a former field representative for LIUNA. Mr. Snipes is expected to testify about several of the allegations Ms. Miro makes in her Complaint.

**Joseph Ganim**, c/o City of Bridgeport.  Joseph Ganim is Bridgeport's Mayor and was at the time relevant to Ms. Miro's Complaint. Mayor Ganim can testify to Ms. Miro's allegations in her Amended Complaint.

**Daniel Roach**, c/o City of Bridgeport.  Daniel Roach is Mayor Ganim's former Chief of Staff. Mr. Roach is expected to testify to Ms. Miro's Amended Complaint.

**Lisa Miro,** 16 Louvain Street, Fairfield, CT 06825.  Lisa Miro is the Plaintiff in this litigation. Ms. Miro is expected to testify about her allegations against the City and authenticate documents. She is a hostile witness.

**Keeper of Records**, City of Bridgeport. The Keeper of Records will testify to the authenticity of any City documents not stipulated to be authentic.

**Dr. Hassan Minahs**, 28 1st Street, Stamford, CT 06905.  Dr. Minhas is an expert witness who will testify about Plaintiff's claims of emotional damages.

**Marie Grace Goncalves**, 15 Cole Street, Bridgeport, CT 06604.    Marie Grace Goncalves is expected to testify about several of Ms. Miro's allegations. She is a hostile witness.

**Donald M. May, Ph.D., CPA.**  Dr. May is an expert witness who will testify about Plaintiff's lack of economic damages.

**Michelle Diaz,** c/o City of Bridgeport.  Michelle Diaz is expected to testify about several of Ms. Miro's allegations.

## IX.   EXHIBITS

## A.    PLAINTIFF'S EXHIBITS

## B.    DEFENDANT'S EXHIBITS

1.    Conclusion of Employment Letter dated September 20, 2017 (will use).

2.      Civil Service Commission/Human Resources Job Posting for Youth Program Manager, dated April 4, 2017 (will use).

3.      Job Description for the Youth Program Manager, dated March 16, 2017 (will use).

4.      Job Description for Typist II (will use).

5.      Text Message from Lisa Miro to Tammy Papa, dated September 21, 2017, at 11:32 a.m. (may use).

6.      Offer Letter for Beach Supervisor from Ellen Gerrity, dated June 8, 2016, at 5:37 p.m. (may use).

7.      Interoffice Memorandum from Tammy Papa to Kimberly Stanley, dated November 15, 2016 (may use).

8.      Offer letter for WPCA Typist II from Eric Amado to Lisa Miro, dated September 21, 2017 (will use).

9.      E-mail from Tara Romano to Tammy Papa regarding Non-bargaining unit person doing bargaining unit work, dated August 22, 2017, at 11:05 a.m. (will use).

10.     Mark Harp Grievance, dated August 22, 2017 (will use).

11.     E-mail from Tara Romano to Philip White regarding Position of Youth Program Manager, dated April 4, 2017 (will use).

12.     City of Bridgeport Sexual Harassment in the Workplace Policy, dated April 1999 (will use).

13.     Only In Bridgeport Comment dated September 22, 2017, at 12:58 p.m., by Lisa Miro (may use).

14.     E-mail from Tara Romano to Thomas Bucci regarding City of Bridgeport and Lisa Miro MPP-32900, dated September 29, 2017 (will use).

15.     E-mail from Thomas Bucci to John Mitola, regarding Lisa Miro, dated September 20, 2017, at 9:20 a.m. (will use).

16.     Message from Lisa Miro to Mayor Joseph Ganim (will use).

17.     Plaintiff's Response to Defendant's First Request for Production for Documents dated December 8, 2021 (may use).

18.     Plaintiff's Answers to Defendant's First Set of Interrogatories in Lisa Miro v. City of Bridgeport, FBT-CV20-5042954 (may use).

19.     Transcript from State Board of Labor Relations, In the Mater of City of Bridgeport and Lisa Miro, MPP-32900-Amended, April 11, 2018, Lisa Miro, Eric Amado, John Ricci's testimony (may use).

20.     Transcript from State Board of Labor Relations, In the Mater of City of Bridgeport and Lisa Miro, MPP-32900-Amended, April 30, 2018, Janene Hawkins, Philip White, Tammy Papa's testimony (may use).

21.     Job Description for the Youth Program Manager, dated May 1, 2016 (may use).

22.     Transcript from Lisa Miro Deposition, dated September 10, 2021 (may use).

23.     Transcript from Lisa Miro Deposition, dated September 15, 2021 (may use).

24.     Transcript from Lisa Miro Deposition, dated October 6, 2021 (may use).

## X.     **DEPOSITION TESTIMONY**

1.     Defendant anticipates that its witnesses, Attorneys Tara Romano and Thomas Bucci, will not be available to testify. Ms. Romano does not live in Connecticut and, as with Mr. Bucci, will be out of town on August 7, 2023. Bridgeport proposes offering Ms. Romano and

Mr. Bucci's video-taped depositions instead of live testimony. Plaintiff will have the opportunity to cross-examine both witnesses at a time acceptable to the witnesses. Ms. Romano's deposition is scheduled for July 10, 2023, and Mr. Bucci's is scheduled for July 12, 2023.

2.      Lisa Miro's deposition testimony from her depositions held on September 10, 15, and October 6, 2021.

3.      Lisa Miro's testimony before the Connecticut State Board of Labor Relations ("SBLR") on April 11, 2018.

4.      John Ricci's testimony before the SBLR on April 11, 2018.

5.      Eric Amado's testimony before the SBLR on April 11, 2018.

6.      Janene Hawkin's testimony before the SBLR on May 30, 2018.

7.      Philip White's testimony before the SBLR on May 30, 20218.

8.      Tammy Papa's testimony before the SBLR on May 30, 2018.

## XI.   STIPULATIONS AND PROPOSED FINDINGS OF FACTS AND LAW

### A.   PROPOSED STIPULATIONS OF UNCONTROVERTED FACTS

1.      Ms. Miro has complied with all jurisdiction prerequisites to an action under Title VII of the Civil Rights Act of 1964 and CFEPA.

2.      At all relevant times, Plaintiff Lisa Miro was a resident of Connecticut.

3.      At all relevant times, Defendant City of Bridgeport was a municipal corporation organized and existing under the laws of the State of Connecticut, employing and continuing to employ 500 or more employees.

4.      Ms. Miro lost her job with the Webster Bank Arena in January 2016.

5.      Ms. Miro asked for John Ricci's ("Ricci") help to obtain a position with the incoming Mayor Ganim administration.

6.     The City arranged for Ms. Miro to interview for a civilian position with the Bridgeport emergency services with an interview during the winter of 2016.

7.     The City did not offer Ms. Miro the position.

8.     Judith Marella held the Lighthouse Youth Program Manager position for fifteen years before retiring in April 2016.

9.     After Ms. Marella retired in April 2016, Lighthouse director Tammy Papa ("Papa") performed the YPM duties and her other work.

10.     Ms. Miro worked in various City positions from 2009 to 2014, and in early June 2016, she told the City's Director of Public Works, John Ricci, that she was unemployed and needed work.

11.     Ricci responded that he could hire Ms. Miro for a seasonal City position and that she would hopefully find a permanent position with the City.

12.     Ricci then informed Papa that he was seeking to place a temporary employee, and Papa responded that her office was short-staffed and would welcome the placement.

13.      On June 8, 2016, City payroll clerk Ellen Gerrity notified City Human Resources Generalist Eric Amado (Amado) that Ms. Miro had been offered a seasonal "beach supervisor" position with the City's parks and recreation department at an hourly rate of $18.00 without benefits.

14.     On June 9, 2016, Eric Amado ("Amado") met with Ms. Miro at the City's civil service office to process her hiring paperwork.

15.     Amado informed Ms. Miro that her position was seasonal and temporary. Id.

16.     On June 13, 2016, Ricci assigned Ms. Miro to Lighthouse, and she commenced working 40 hours a week.

17.     Plaintiff was initially responsible for scheduling interviews of applicants for the summer training and employment program.

18.     Ms. Miro subsequently managed professional development for Lighthouse staff and attended specific youth services meetings but received no additional training herself.

19.     She did not perform the essential duties of the Lighthouse YPM, either as outlined in the original job description or as subsequently revised.

20.     On October 7, 2016, Papa submitted a personnel position request form seeking to fill Judith Marella's vacant Youth Program Manager position.

21.     On November 16, 2016, Ricci informed Ms. Miro via a letter that her seasonal employment with the City had ended and her "last scheduled work day is Wednesday, November 23, 2016."

22.     However, Ms. Miro's employment did not end, and she continued working at Lighthouse.

23.     On February 7, 2017, Bridgeport's Personnel Director approved Papa's request to fill the YPM position.

24.     On April 4, 2017, the City notified LIUNA's bargaining unit members that the position was available by posting the job.

25.     On April 6, 2017, Lighthouse Site Monitor/Special Project Coordinator and LIUNA bargaining unit member Mark Harp ("Harp") signed the YPM posting and indicated his interest in the position.

26.     In August 2017, Harp filed a grievance under the LIUNA collective bargaining agreement with the City contending that Ms. Miro was performing bargaining unit work, and

based on the information at a Step II hearing, Senior Labor Relations Officer Philip White

("White") determined that the allegations were true and sustained the grievance.

27.     Also, in August 2017, Papa asked the Mayor's Chief of Staff, Dan Shamas

("Shamas"), whether any full-time permanent positions with benefits were available to Ms. Miro.

28.     Shamas indicated a job might be available at the City's Water Pollution Control

Authority ("WPCA") office.

29.     On September 15, 2017, Ms. Miro filed a prohibited labor practices complaint

with the SBLR.

30.      On September 20, 2017, Papa approached Ms. Miro in the Lighthouse office,

informing her that she believed the City would conclude Ms. Miro's Lighthouse employment and

offer her another City position.

31.     Ms. Miro was offered a Typist II position that paid $42,259.00. At the time, Ms.

Miro was paid $18.00 per hour at Lighthouse.

32.     Papa urged Ms. Miro to accept the job and withdraw the pending prohibited

practice complaint.

33.     Ms. Miro responded to Papa that she had been working hard for over a year and

had been promised some kind of retroactive compensation.

34.     On September 20, 2017, at 9:16 a.m., Ms. Miro's attorney, Thomas Bucci, e-

mailed Associate City Attorney John Mitola, stating that

> "I spoke with [Ms. Miro] yesterday. She rejected the proposal [for the Typist II
> position]; she was 'insulted' by the offer; she felt demeaned and degraded. [Ms.
> Miro] is not a secretary but an administrator; she doesn't do secretarial work. She
> wants to remain in her administrator 'Light House' position . . . ."

35.     On September 21, 2017, and before 11:32 a.m., Papa contacted Ms. Miro by telephone and again urged Complainant to accept another City position and to withdraw her pending prohibited practice complaint.

36.     Ms. Miro responded by text message to Papa at 11:32 that morning and stated, in the relevant part:

> "[P]ertaining to your phone call this morning. I will drop the lawsuit if they give me the retro promised. That is not unfair to ask Tammy. I've been doing the work and I did my job in good faith waiting for my salary and benefits. There is no reason why they can't make good on their promise ..."

Id.

37.     Then, at 1:23 p.m., Eric Amado sent Ms. Miro an e-mail that stated in the relevant part:

> "Congratulations on being [sic] offered the position of Typist II with the [ [City's] Water Pollution Control Authority! Attached for your review and acceptance is your official offer letter. Also attached, is a general benefits overview afforded to this position if you were to accept.
>
> Please indicate your acceptance of this position on all terms by signing the offer letter and returning to me. If you choose not to accept this position please reply back to this email, declining this offer ..."

38.     In the afternoon of September 21, 2017, White, Ms. Miro, and Ricci met in White's office.

39.     White presented Ms. Miro with a Conclusion of Employment letter that informed her that her "temporary/seasonal position with the [City's] Parks and Recreation Department has concluded," and her "last scheduled work day is effective, September 21, 2017." Id. at *5.

40.     White discussed the WPCA Typist II job offer with Ms. Miro during that meeting.

41.     In response, Ms. Miro threatened Ricci with releasing tapes that included him doing terrible things, such as sexual harassment, during the meeting with White and Ricci.

42.     When White pressed Ms. Miro for more information, she did not know who had the tapes or where they were. They have never appeared.

43.     Ms. Miro rejected the Typist II position.

44.     A few days later, Ms. Miro sent Mayor Joseph Ganim an e-mail threatening to file a sexual harassment claim against the City and releasing "negative, documented proof of yet other employees you've surrounded yourself" to hurt his campaign for governor.

45.     Chapter 12, § 3 of the City Charter authorizes the Director of Public Facilities to "transfer positions and employees between units of the department of public facilities as the need arises and funds are available."

46.     The City Charter does not give the Director of Public Facilities the power to promise specific positions and salaries.

47.     Chapter 12 § 2 allows the Director of Public Works to appoint Deputy Directors, but the Director must have the Civil Service Commission's approval.

48.     Ms. Miro was not part of any bargaining unit between June 2016 and September 2017.

49.     Ms. Miro could have joined a bargaining unit if she had chosen.

50.     The City hired Ms. Miro as a temporary, seasonal employee with the optimistic expectation that she would find a permanent City position in the future.

51.     To the benefit of Ms. Miro, the City continued to employ her in the Lighthouse Program for a durational period contrary to its policy concerning seasonal employees.

`

## B.  DEFENDANT'S STATEMENT OF APPLICABLE LAW

### 1.  TITLE VII AND CFEPA HOSTILE WORK ENVIRONMENT CLAIMS: CLAIMS ONE AND TWO

Under the hostile work environment doctrine, even if an employee does not experience a specific adverse action, she may have a viable claim under both Title VII and CFEPA for sexual discrimination if the harassment was so pervasive that it changed the terms and conditions of her employment. The elements of such a claim are the following:

(1) The plaintiff was subjected to unwelcome harassment, ridicule, or other abusive conduct;

(2) That the abusive conduct was motivated, at least in part, by Ms. Miro's gender, that is, the fact [in this case] that she is a woman; and

(3) That the abusive conduct was so severe or pervasive that both the plaintiff and a reasonable person in her position would find her work environment so hostile or offensive that it altered the conditions of her employment by creating an abusive work environment; and

(4) That there is some specific basis for imputing the objectionable conduct to the employer, in this case the City of Bridgeport.

Sotak v. Bertoni, 501 F. Supp. 3d 59, 76 (N.D.N.Y. 2020); Alfano v. Costello, 294 F.3d 365, 373–74 (2d Cir. 2002).

### a.       Elements 1 and 2: Unwelcome Harassment Based on Gender

First, it must be determined whether the plaintiff was subjected to unwelcome harassment because of her gender. Title VII and CFEPA define "sexual harassment" as any unwelcome harassment in the workplace that is directed at an employee because of his/her gender. Conduct is unwelcome if it is not solicited or invited and is regarded as undesirable or offensive. Sexual harassment can be sexual advances, requests for sexual favors, or expressions of sexual desire. However, the acts at issue do not need to be motivated by sexual urges. Differential treatment, or rude, disparaging behavior based on gender, can also constitute sexual

harassment. Incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination. For example, the same individual is accused of multiple acts of harassment, some overtly sexual and some not. Any harassment directed at an employee because of the employee's gender is sexual harassment.

However, neither Title VII nor CFEPA prohibits an employer from maintaining a nasty, unpleasant workplace, even if the reasons are of a sexual nature. Instead, they prohibit employers from discriminating against an employee (including by subjecting them to hostile working conditions) because of such an individual's gender. It is not enough that the work environment is generally harsh, unfriendly, unpleasant, crude or vulgar to all employees.  To establish a hostile work environment, a plaintiff must show that she was harassed because of her gender.

Bridges v. Eastman Kodak Co., No. 91 CIV. 7985 (RLC), 1995 WL 529880, at *3 (S.D.N.Y. Sept. 8, 1995), opinion clarified, No. 91 CIV. 7985, 1996 WL 32325 (S.D.N.Y. Jan. 26, 1996), opinion corrected and superseded, No. 91 CIV. 7985 (RLC), 1996 WL 47304 (S.D.N.Y. Feb. 6, 1996), aff'd, 102 F.3d 56 (2d Cir. 1996); Vereen v. City of New Haven, No. 3:17-CV-1509 (VLB), 2018 WL 6069098, at *5 (D. Conn. Nov. 20, 2018); Brown v. Henderson, 257 F.3d 246, 252 (2001); Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80 (1998); Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Leibovitz v. N.Y. City Transit Auth., 252 F. 3d 179, 189 (2001); Hayut v. State Univ. of N.Y., 352 F.3d 733, 744-45 (2d Cir. 2003); Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 514 (S.D.N.Y. 2010).

### b. Element 3: Abusive Work Environment

A plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment

were altered. Simple teasing, offhand comments, or isolated incidents of offensive conduct
(unless extremely serious) will not support a claim of discriminatory harassment.

This standard has both a subjective and objective component. You must look at all
the circumstances surrounding the unwelcome conduct.

### a.    Objective Element

To satisfy the objective component, the misconduct must be severe and pervasive.
The matter of whether the conduct alleged was so "severe or pervasive" as to create "an
objectively hostile or abusive environment" is to be decided on the totality of the circumstances,
in light of such factors as:

(1)    The nature of the environment Ms. Miro worked in;

(2)    The nature of the conduct;

(3)    The severity of the conduct;

(4)    The frequency of the conduct;

(5)    Whether the conduct was physically threatening or humiliating;

(6)    Whether the conduct consisted of merely occasional teasing;

(7)    Whether the conduct interfered with Ms. Miro's work performance; and

(8)    The context in which the alleged sexual harassment occurred.


A plaintiff alleging a hostile work environment must demonstrate that either a single
incident was extraordinarily severe or that a series of incidents were sufficiently continuous or
concerted to have altered the conditions of her working environment. The more severe the
harassing conduct, the less frequent it must be to find that it amounted to unlawful sexual
harassment. The plaintiff must produce evidence that the workplace was so severely permeated

with discriminatory intimidation, ridicule, and insult, that the terms and conditions of her

employment were altered.

> Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000); Mills v. S. Conn. State
>
> Univ., 519 Fed Appx. 73, 75 (2d Cir. 2013); Desardouin v. City of Rochester, 708 F.3d 10, 105
>
> (2d. Cir. 2013); Das v. Consol. Sch. Dist. Of New Britain, 369 Fed. Appx. 186, 189-90 (2d Cir.
>
> 2010); Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Russo v. N.Y. Presbyterian Hosp.,
>
> 972 F. Supp. 2d 429, 446-47 (E.D.N.Y. 2013).

### (b)  Subjective Element

Under Title VII and CFEPA, a plaintiff must also prove that the alleged

misconduct created an environment that she subjectively perceived at the time as hostile or

abusive to establish a hostile work environment claim.

> Robinson v. Harvard Prot. Servs., 495 Fed. Appx. 140, 141 (2d Cir. 2012); Patane v.
>
> Clark, 508 F.3d 106, 113 (2d Cir. 2007).

### c.  Element 4: Bridgeport's Liability for Harassment

This is a matter of Agency, discussed infra.

### 2.  COUNT THREE QUID PRO QUO SEXUAL HARASSMENT

A quid pro quo claim exists when an employer alters the terms and conditions of

an employee's terms of employment because the employee refused to submit to a supervisor's

sexual advances.

The elements of a quid pro sexual harassment claim are:

(1) The employee's supervisor made unwanted sexual advances toward the

plaintiff;

(2) The employer subjected the plaintiff to an adverse employment action that changed the terms and conditions of the employee's employment; and

(3) A causal connection links the adverse employment action to a plaintiff's rejecting her supervisor's sexual advances.

Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006)

### a.        Element 1: Sexual Advances

In evaluating the proof of a quid pro sexual harassment claim, a jury, must determine if the plaintiff suffered unwanted sexual advances from her supervisor. First, it is the plaintiff's burden to demonstrate by a preponderance of the evidence that her supervisor or another employee made sexual advances toward her. Second, the fact finder must examine whether the plaintiff did or did not welcome the alleged sexual attention by looking at her participation in or response to the conduct.

Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994), cert. denied sub nom. Trustees of Columbia Univ. in City of New York v. Karibian, 512 U.S. 1213 (1994); McGregor v. Jarvis, No. 9:08-CV-770 GLS/RFT, 2010 WL 3724133, at *11 (N.D.N.Y. Aug. 20, 2010), report and recommendation adopted, No. 9:08-CV-770 GLS/RFT, 2010 WL 3724131 (N.D.N.Y. Sept. 16, 2010).

### b.        Element 2: Plaintiff Subjected to Adverse Employment Action

A quid pro quo claim requires that the plaintiff demonstrate that she suffered a tangible adverse employment action. A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant difference in benefits.

The employer's business decisions are entitled to significant deference. The law does not authorize the courts or a jury to substitute their own judgment for an employer's business decision. The law does not permit a plaintiff to prevail merely because the trier of fact disagrees with the employer's decision or thinks the decision was unfair, unjust, or a mistake. The question is not whether the employer's method was sound, its judgments the best or the right ones, or whether the jury would have done the same thing if in the employer's shoes at the time. The question is whether the plaintiff was subjected to an adverse employment action by an agent of the employer because of her gender.

Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998).

### c.    Element 3: A Casual Connection Exists Between the Rejection of Unwanted Sexual Advances and the Adverse Employment Action

Finally, the plaintiff must demonstrate that a causal connection exists between an adverse employment action and her rejecting unwanted sexual advances. A plaintiff can establish a causal link in two ways. First, direct evidence that the offending supervisor threatened or warned her that failing to accede to his sexual advances would result in an adverse employment action. Second, when there is a lack of direct evidence, a plaintiff can provide circumstantial evidence that an adverse action followed closely in time after the employee rejected or complained about the supervisor's sexual advances. The period between the rejection and/or complaint and the adverse employment action should be days or weeks.

Messer v. Fahnestock & Co. Inc., No. 103CV-04989-ENV-JMA, 2008 WL 4934608, at *15 (E.D.N.Y. Nov. 18, 2008); Carter v. New York, 310 F. Supp. 2d 468, 478 (N.D.N.Y. 2004), aff'd sub nom. Carter v. State of New York, 151 Fed. Appx. 40 (2d Cir. 2005).

### 3.    AGENCY

In this case, the plaintiff alleges that Mr. John Ricci acted as an agent of the City of Bridgeport in his actions toward her. A City cannot act on its own, but only through its agents. An agency relationship is a fiduciary relation resulting from the manifestation of consent by one entity to another that the other shall act on its behalf, subject to its control and authorization. Generally, a principal, in this case the City of Bridgeport, is liable for the acts of its agent.

There are two kinds of agency relationships, one where the agent has actual authority to act on the other's behalf and one where there is an apparent authority to act on the principal's behalf. Apparent authority exists if the principal's conduct makes it appear that the agent has the authority to act on its behalf, and when acting in good faith, the party dealing with the agent reasonably believed the agent had the authority.

Bridgeport is a municipal corporation, and municipal corporations act through their employees and officials. Connecticut's public policy is that a municipal charter's terms limit an agent's authority when acting on behalf of a municipal corporation. Furthermore, anyone who deals with a municipality is held to be on legal notice of this limitation on any supposed agent's authority.  Mr. Ricci did not have authority under the Bridgeport City Charter to off plaintiff the permanent employment position that she claims he promised her.

Butto v. Collecto Inc., 845 F. Supp. 2d 491, 497 (E.D.N.Y. 2012); Quinn & Co., LLC v. McDermott, No. HHDCV196111778S, 2021 WL 3722702, at *3 (Conn. Super. Ct. July 20, 2021); Yale Univ. v. Out of the Box, LLC, 118 Conn. App. 800, 808 (2010); Bellsite Dev., LLC v. Town of Monroe, 155 Conn. App. 131, 140–41, cert. denied, 318 Conn. 901 (2015); Fernandes v. Trumbull Bd. of Educ., No. FBTCV206099457, 2021 WL 1533936, at *4, n. 11 (Conn. Super. Ct. Mar. 23, 2021); see, Charter of the City of the City of Bridgeport, ch.12, §§2, 3.

4.      **DAMAGES**

a.      **COMPENSATORY AND ECONOMIC DAMAGES**

Compensatory damages are designed to fairly and justly compensate a plaintiff for any injuries suffered. Compensatory damages may include reasonable compensation for any emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses a plaintiff suffered. This type of harm generally is called emotional distress. However, a plaintiff may not recover for emotional distress unless she presents evidence of such harm.

Under both Title VII and CFEPA, a successful plaintiff is also entitled to economic damages measured in terms of wages and benefits lost as a result of the illegal discrimination.

To recover any damages, a plaintiff must present sufficiently accurate and complete evidence to allow the fact finder to estimate the alleged damages with reasonable certainty. Reasonable certainty of proof is all that is required, and the amount of any damages may be determined approximately upon reasonable inferences and estimates. Damages, if any, must be fair, just and reasonable, and reflective of the harm a plaintiff has suffered.

Durr v. Slator, 558 F. Supp. 3d 1, 44 (N.D.N.Y. 2021); Dejesus v. Vill. of Pelham Manor, 282 F. Supp. 2d 162, 178 (S.D.N.Y. 2003); Jennings v. Town of Stratford, 263 F. Supp. 3d 391, 406 (D. Conn. 2017); Liberty Mut. Ins. Co. v. Fast Lane Car Serv., Inc., 681 F. Supp. 2d 340, 349 (E.D.N.Y. 2010).

b.      **CAUSATION AND DAMAGES**

It is essential to distinguish between the existence of a violation of Ms. Miro's rights and the existence of injuries naturally resulting from that violation. One can suffer a violation of one's rights but suffer no damages at all.

Chanoff v. U.S. Surgical Corp., 857 F. Supp. 1011, 1019 (D. Conn. 1994), aff'd, 31 F.3d 66 (2d Cir. 1994), cert. denied, 513 U.S. 1058 (1994), aff'd, 33 F.3d 50 (2d Cir. 1994).

### c.    PROXIMATE CAUSE

It is also important to remember that when an injury or loss follows a party's act or omission and that injury or damage may be attributable through a causal connection to that act or omission, then that act or omission is said to be the proximate cause of that injury or loss. If an act or omission of a party is found to have been a substantial factor in bringing about an injury or loss, then that act or omission is also a proximate cause of that injury or loss. However, if the act or omission is not a substantial factor in bringing about that injury or loss, then it is not the proximate cause. When that happens, the doer of the act or omission is not liable under the law for the damage or loss.

Pappas v. Watson Wyatt & Co., No. 3:04CV304EBB, 2007 WL 4178507, at *4 (D. Conn. Nov. 20, 2007).

### d.    NOMINAL DAMAGES

Nominal damages may be awarded when a defendant has violated Title VII or CFEPA, but a plaintiff has suffered no actual damage as a natural consequence of that deprivation. The mere fact that a violation of Title VII or CFEPA occurred is an injury to the person entitled to enjoy that right, even when no actual damages flow from the deprivation. If a jury returns a verdict for a plaintiff on any or all of her Title VII or CFEPA claims, but finds that she has failed to prove by a preponderance of the evidence that she suffered any actual damages, the jury may award nominal damages of one dollar.

Amato v. City of Saratoga Springs, N.Y., 170 F.3d 311, 317 (2d Cir. 1999); Optima Media Grp. Ltd. v. Bloomberg L.P., No. 17-CV-01898 (AJN), 2021 WL 1941878, at *18 (S.D.N.Y. May 14, 2021)

## C.   STATEMENT OF CONTESTED ISSUES OF FACT AND LAW

The parties agree that the following are contested issues in this case:

1)   Did Bridgeport discriminate against Ms. Miro because of her gender and create a hostile work environment violating Title VII and CFEPA?

2)   Did Ms. Miro find any of John Ricci's behavior during her employment with the City subjectively offensive?

3)    Did Bridgeport end Ms. Miro's employment because she allegedly reported John Ricci's supposed behavior to the City?

4)   Did Ms. Miro ever report any offensive behavior by John Ricci?

## XI   TRIAL TO JURY

### A.  PROPOSED VOIR DIRE QUESTIONS

1.  Attached

### B.   PROPOSED JURY INSTRUCTIONS

1.  Attached

### C.   JURY INTERROGATORIES/PROPOSED VERDICT FORM

1.  Attached

### D.   PROPOSED CASE STATEMENT

The Plaintiff in this case, Lisa Miro, is a former City employee. She worked from June 13, 2016, until September 21, 2017. The City hired Ms. Miro as a seasonal and

temporary employee after she told John Ricci that she needed a job. Ms. Miro's employment ended on September 21, 2017. Ms. Miro claims that she was a victim of sexual harassment by John Ricci, the City of Bridgeport's Director of Public Facilities. She further claims that her refusal to give Mr. Ricci sexual favors led to her termination of employment. The City denies all of her charges. It claims that Ms. Miro's allegations of sexual harassment are complete fabrications and that she left the City's employment for legitimate business reasons.

**E.      ANTICIPATED EVIDENTIARY PROBLEMS**

Defendant does not see any anticipated evidentiary problems. However, since Plaintiff did not produce a listing of her exhibits until after 1:00 p.m. on July 7, 2023, the City reserves it right to review and supplement this section.

**1.      Motions in Limine**

Defendant cannot produce comprehensive motions in limine since the City was not provided with either a listing of Plaintiff's exhibits or the exhibits themselves until after 1:00 p.m. on July 7, 2023. Defendant has attached four motions in limine relating to matters it suspects may be raised by Plaintiff. Defendant requests the Court's indulgence respecting Defendant's submitting additional motions in limine.

**F.      COURTROOM TECHNOLOGY**

Defendant believes it may need to use the Court's computer system and projection system during the trial. The City will submit the necessary Request for Courtroom Technology Form in accordance with the Local Rules Standing Order Regarding Trial Memorandums in Civil Cases.

Done at Stratford, Connecticut, this 7th day of July, 2023.

THE DEFENDANT


By:     /s/Reese B. Mitchell
        Reese B. Mitchell (ct30226)
        Robert B. Mitchell (ct307466)
        Mitchell & Sheahan P.C.
        999 Oronoque Lane, Suite 203
        Stratford, CT 06614
        Tel.:  (203) 873-0240
        Fax:  (203) 873-0235
        reesemitchell@mitchellandsheahan.com
        rbmitchell@mitchellandsheahan.com


**CERTIFICATION**


        This is to certify that on July 7, 2023 a copy of the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing. Notice of

this filing will be sent by email to all parties by operation of the Court's electronic filing

system or by mail to anyone unable to accept electronic filing as indicated on the Notice

of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By:/s/Reese B. Mitchell

Reese B. Mitchell (ct30226)
Robert B. Mitchell (ct307466
Mitchell & Sheahan P.C.
999 Oronoque Lane, Suite 203
Stratford, CT 06614
Tel.:  (203) 873-0240
Fax:  (203) 873-0235
reesemitchell@mitchellandsheahan.com
rbmitchell@mitchellandsheahan.com)